**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**


| | | |
|---|---|---|
| ANDREW ETAPA | ) | CASE NO.  5:08-cv-1972 |
| Plaintiff, | ) | |
| | ) | |
| v | ) | JUDGE O'MALLEY |
| | ) | |
| MICHAEL J. ASTRUE, | ) | MAGISTRATE JUDGE VECCHIARELLI |
| Commissioner of Social Security | ) | |
| | ) | |
| Defendant. | ) | **REPORT & RECOMMENDATION** |
| | ) | |


Plaintiff, Andrew Etapa ("Etapa"), challenges the final decision of the

Commissioner of Social Security, Michael J. Astrue ("Commissioner"), denying Etapa's

applications for a period of Disability Insurance Benefits ("DIB") under Title II of the

Social Security Act, 42 U.S.C. § 416 (i), and for Supplemental Security Income ("SSI")

under Title XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 423 and 1381(a).  This

Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the

undersigned United States Magistrate Judge for a report and recommendation pursuant

to a referral under Local Rule 72.2(b).

For the reasons set forth below, the final decision of the Commissioner should be

AFFIRMED.

**I.  Procedural History**

Etapa filed his application for SSI on September 21, 2004, and an application for

DIB on September 23, 2004.  Both applications allege disability as of August 1, 1999.

His applications were denied initially and upon reconsideration. Etapa timely requested an administrative hearing.

Administrative Law Judge Mark M. Carissimi ("ALJ") held a hearing on November 9, 2006, at which Etapa, who was represented by counsel, and Brett L. Salkin, vocational expert ("VE") testified.  The ALJ issued a decision on December 21, 2006 in which he determined that Etapa was not disabled.  The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied further review. Etapa filed an appeal to this Court.

On appeal, Etapa claims the ALJ erred: (1) by failing to properly address the medical reports of Dr. Robinson, Chris Wood, physical therapist ("PT"), and Nancy Quiana, registered nurse clinical specialist ("RNCS"); (2) by failing to include manipulative limitations in the hypothetical question to the VE; and (3) by failing to include in the hypothetical question to the VE, for the purposes of the SSI claim, the assumption that Etapa was closely approaching advanced age.

The Commissioner disputes Etapa's claims.

## II.  Evidence

### A.  Personal and Vocational Evidence

Etapa was born on February 8, 1955.  Transcript ("Tr.") 27.  He was 44 years old at the time of his alleged onset of disability, and 51 years old at the time of the hearing. Etapa quit high school, and later obtained his GED.  (Tr. 338, 564) He served in the United States Marine Corps from 1979-1983. (Tr. 530) He attended the University of Akron for two years.  (Tr. 534) He worked as an appliance salesman from 1983-1995, and as a fabricator from 1995-1999.  (Tr. 534-526, 530) Etapa has not worked since

2

1999.  (Tr. 518, 523)

### B.  Medical Evidence

On January 23, 2001, Etapa presented to the Veteran's Administration hospital ("VA") for a routine follow-up.  Etapa complained of chronic low back pain and numbness in his neck.  He rated his pain as three on a scale of one to 10, 10 being the most severe.  He also complained of feeling sad or depressed much of the time.  (Tr. 327-328)

On April 13, 2001, Etapa presented to the mental health section of the VA.  He had not been evaluated by the mental health section since October 2000.  Etapa reported to Nancy A Quiana, clinical nurse specialist, that he was depressed and had trouble sleeping.  He stated that his anxiety was worsening, he was socially isolated, his concentration was poor, and he thinks of suicide, but has no plan.  He was not taking any psychiatric medication, but self medicated with alcohol.  He had a recent DUI, and stated he had not had any alcohol since the arrest.  Quiana prescribed paxil and amytriptyline, and indicated that she would inquire about having Etapa treated for substance abuse.  (Tr. 324)

On May 3, 2001, Etapa was incarcerated in the Summit County jail for DUI. The case worker at the jail contacted the VA to inquire about Etapa's medications.  The social worker at the VA informed the Summit County jail case worker that Etapa was taking paxil and amytriptyline, and that she would contact Quiana about having Etapa's medications delivered.  The medications were later delivered to the jail.  (Tr. 323)

On May 8, 2001, Etapa saw David Shawlson, clinical social worker, on an emergency referral from the Orianna House where he was serving a six month

3

sentence for his ninth DUI. Shawlson reported that Etapa was highly agitated and tearful, and his affect and mood were depressed.  Shawlson noted that Etapa may need medication to stabilize, and planned to consult with Dr. Shirley.  (Tr. 322-323)

On May 9, 2001, Etapa saw psychiatrist Pamela Shirley.  Dr. Shirley, after diagnosing Etapa with an anxiety disorder complicated by his present situation, and possible dysthymia, prescribed medication for him.  (Tr. 318) On the same day, Etapa presented to Quiana and Peter Russo, physician assistant.  Russo noted that Etapa presented for persistent back pain.  He diagnosed Etapa with alcoholism, panic disorder, anxiety/depression, and nicotine abuse.  (Tr. 320) Quiana noted that Etapa's affect was stressed, and his mood was depressed.  He had heightened anxiety when he contemplated appearing before the judge for his DUI.  He was oriented and his memory was intact.  (Tr. 321)

On May 17, 2001 Robert Kindle, R.N. completed a substance abuse dependency assessment of Etapa.  (Tr. 309-314) Etapa reported the following.  Chronic back pain interferes with his life; he has had low back pain for over 20 years, and upper back pain since a work injury in 1995 (Tr.310); he had been treated three times for alcohol abuse, but never for drug abuse; he was extremely bothered by his alcohol problem; and he had eight DUI charges and 20 charges for reckless driving, speeding, or driving without a license.  Kindle opined that Etapa was minimizing his drinking and related problems. (Tr. 312)

Etapa also reported that he had never received inpatient treatment for psychological problems, and that he had serious depression and anxiety or tension during his lifetime, including the 30 days prior to his assessment.  He was extremely

4

bothered by his psychological or emotional problems, and reported that these conditions are disabling in that he can no longer function effectively.  (Tr. 314)

Etapa reported he spends his leisure time alone, but is dissatisfied doing so.  He states his only leisure activity is drinking.  He would like help considering other uses of his free time.  (Tr. 315)

Kindle diagnosed Etapa with the following: (1) alcohol dependence with psychological dependence in early full remission; (2) nicotine dependence with psychological dependence; (3) cannabis abuse in full remission; (4) depressive disorder NOS; and (5) rule out anxiety disorder.  He assigned Etapa a current Global Assessment Functioning ("GAF") score of 42 and opined that his highest GAF score in the past year was 44.[1]  (Tr. 305)

On May 23, 2001, Etapa was admitted to the Primary Recovery Skills Program, an inpatient alcohol treatment program.  (Tr. 301) He was discharged on June 20, 2001 after successfully completing the program, and successfully participating in individual and group therapy.  His diagnosis at the time of discharge were: (1) alcohol dependence with physiological dependence in early full remission; (2) nicotine dependence with physiological dependence; (3) cannabis abuse in sustained full remission; (4) depressive disorder not otherwise specified; (5) rule out generalized

---

[1]A GAF score between 41 and 50 indicates serious symptoms or a serious impairment in social, occupational, or school functioning.  A person who scores in this range may have suicidal ideation, severe obsessional rituals, no friends, and may be unable to keep a job.  *See Diagnostic and Statistical Manual of Mental Disorders 34 (American Psychiatric Association, 4th ed. revised, 2000).*

anxiety disorder; (6) personality disorder not otherwise specified; (7) chronic lower back, neck, knee, and elbow pain; and (8) problems with legal and social systems.  (Tr. 224) Etapa's GAF score was 42.  (Tr. 224) At the time of his discharge, Etapa reported no anxiety attacks and hardly any depression.  (Tr. 225) During his admission, Etapa was evaluated by the physical therapy department and given a back brace.  (Tr. 225)

After his discharge, Etapa enrolled in an outpatient recovery skills program.  (Tr. 267) He was discharged from the program on October 10, 2001 for missing four group sessions in a row. (Tr. 246)

On November 30, 2001, he presented to Quiana, primarily complaining of a longer sleep pattern than usual.  Quiana noted that Etapa's mood was more even than in previous assessments.  She rated it a two out of 10, with 10 being the most severe. She noted that Etapa was anxious, and his speech was rapid, and at times pressured. (Tr. 244-245)

On December 14, 2001, Shawlson, a VA social worker, completed a psychological disability verification form on Etapa's behalf for the University of Akron. Shawlson indicated that Etapa had an anxiety disorder and dysthymia.  Shawlson indicated that Etapa's disabilities had been life long; however, he opined that Etapa should be able to attend to a college schedule if he takes his medication, and Etapa's disability most likely interferes with his ability to concentrate.  (Tr. 454)

On January 8, 2002, Dr. John Robinson performed a consultive examination. Etapa stated that he has had low back pain for about 10 years, and that it is slowly worsening.  He described the pain as a constant hot poker-like sensation that radiates into the right buttock and down the posterior thigh to the knee.  It is worse with any

6

bending, twisting or lifting of 25-50 pounds.  Physical therapy also made the pain worse.
A spine surgeon recommended surgery but due to Etapa's co-morbidities and obesity,
the risks were too high.  Etapa complained of numbness in both hands that has been
ongoing for years and slowly worsening.  He also stated that he has had nerve
conduction studies that showed severe bilateral carpal tunnel syndrome.  He also has
some mild weakness of the right leg. (Tr. 329)

Physical examination showed his cranial nerves intact.  His reflexes were
symmetric in the upper extremities and diminished, but symmetric in the lower
extremities.  He had decreased sensation to light touch in the right leg and very positive
straight leg raising on the right.  (Tr. 331) X-rays revealed his that his left knee was
normal.  (Tr. 332)  An X-ray of his lumbosacral spine revealed:  disc space narrowing at
L5-S1; evidence of lumbar facet arthropathy at L5-S1, bilaterally; a hypertrophic spicule
formation at the right side of L2-L3; bridging osteophyte at the right side of L2-L3; and a
radiographically normal sacrum and coccyx.  (Tr. 333)

Etapa's range of motion and manual muscle testing were normal, including
normal grasp, manipulation, and fine coordination with the exception of abnormal
pinching in his right hand.

Dr. Robinson opined that Etapa had right lumbar radiculopathy, coronary artery
disease with chronic stable angina, COPD, carpal tunnel syndrome, hypertension, and
urgency incontinence.  He further opined that based on his history and physical
examination, Etapa's exertional limitations would be limited to occasionally lifting 10
pounds.  He could not stand or walk for more than two hours in an eight hour workday.
His ability to sit was unlimited. His ability to push/pull would be significantly limited.  He

7

would never be able to climb, balance, kneel, crouch, or crawl.  He would have manipulative limitations of handling, fingering, and feeling in both hands, but no limitation in reaching.  He would have no visual or communicative limitations, or significant environmental limitations.  (Tr. 331)

On January 23, 2002, Dr. Gary J. Sipps performed a consultive psychological examination.  (Tr. 338-342) Dr. Sipps concluded that Etapa's ability to concentrate and attend to task were low average.  His capacity for understanding was adequate.  He was unimpaired in his ability to understand simple instructions.  He was mildly limited in his ability to comprehend complex material.  His capacity for remote recall was adequate.  His capacity for recent recall was adequate to deficient.  His immediate memory was severely impaired, but his working and general memory were intact.  His capacity for sustained concentration and persistence was low average.  He was mildly impaired in his ability to direct his attention effectively to tasks at hand for a reasonable period of time.  His capacity  for social interaction was low average.  He was moderately impaired in his capacity to deal effectively with the general public.  He was mildly impaired in his ability to relate to coworkers and supervisors, but unimpaired in his ability to respond to familiar others.  His capacity for adaption was low average.  He was mildly impaired in his ability to respond appropriately to novel situations and variations in a work setting.  His overall judgment and insight into his current situation was low average.  His overall functioning was at a mildly reduced efficiency with his medications. (Tr. 341-342)

Dr. Sipps diagnosed Etapa with depressive disorder NOS in partial remission with medication, alcohol abuse, and alcohol dependence in reported remission.  He assigned

8

Etapa a GAF score of 55 with current medication.[2]  (Tr. 342)

Etapa presented to Russo on May 23, 2002 for a follow up appointment.  He complained of chronic lower back pain with morning stiffness.  He rated his pain as five out of 10 in his right neck area and reported that he had not felt down, depressed, or hopeless in the past year.  (Tr. 242-243)

On August 18, 2002, Etapa presented to Russo for a follow up appointment.  He rated his pain at a seven and stated that he had pain in his elbows and knees that worsens with damp weather.  He reported mild discomfort in his back.  (Tr. 238-239)

On June 3, 2003, Etapa presented to Russo for a follow up appointment.  He reported lower back pain as a six out of 10.  He stated that he takes his dog for a walk and walks around the college campus. (Tr. 236-237)

On November 8, 2004, Dr. Candido Anaya performed a consultive physical examination of Etapa.  (Tr. 367-374) Etapa's chief complaint was chronic neck and back pain. (Tr. 367) Dr. Anaya opined that Etapa's upper extremities showed normal strength and normal range of motion. His hands appeared to have normal ability to grasp and manipulate.  There were no obvious neurological deficits or any other obvious abnormality detected in the examination of the hands.  His muscle mass in both arms and forearms was normal and symmetrical.  His sensation appeared to be preserved.  His lower extremities showed full range of motion, with normal strength; however, there

_____

[2] A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  A person who scores in this range may have a flat affect, occasional panic attacks, few friends, or conflicts with peers and co-workers.  *See Diagnostic and Statistical Manual of Mental Disorders* 34 (American Psychiatric Association, 4th ed. revised, 2000).

was mild to moderate pain in his low back with internal and external rotation of both hips.  There was no clubbing, cyanosis, or edema.  He was alert and oriented.  His cranial nerves II through XII appeared intact.  His speech, memory, and comprehension were normal.  His rapid alternating movements appeared normal, his gait was normal, and there was no need for a cane.  (Tr. 368-360)

Etapa told Dr. Anaya that he had an MRI nine years prior that indicated a herniation at C3-C4.  Dr. Anaya recommended review of those records.  Dr. Anaya opined that Etapa would likely have no difficulty with handling light objects with his upper extremities, but may have difficulty with heavy objects as it may place a strain on his neck and possibly exacerbate his cervical herniation. He opined that Etapa's low back discomfort with range of motion in his hips was suggestive of a lumbar strain; and Etapa's history of low back pain does not suggest any nerve entrapment.  Further, Dr. Anaya opined that based on his physical examination, Etapa should not have any difficulty with sitting, standing, transient walking, or handling light objects with his upper extremities.  He may have difficulty with repetitive bending or heavy lifting due to his chronic lumbar symptoms.  (Tr. 369)

On January 18, 2005, Etapa returned to the VA for psychological treatment where he was seen by Dr. Kong Y. Kwon.  Dr. Kwon noted that Etapa was last seen by Quiana November 2001.  Etapa reported feeling overwhelmed, anxious, and depressed.  He felt overwhelmed by everything.  He reported that he was staying at his mothers house idling.  Dr. Kwon diagnosed Etapa with major depressive disorder and history of alcohol abuse, and assigned a GAF score of 45.  Dr. Kwon prescribed medication and recommended supportive therapy with individual counseling.  (Tr. 415-416)

10

On January 26, 2005, Etapa presented to Russo.  He acknowledged that he had not been to see Russo for some time, and stated that he was out of blood pressure medicine and had back pain.  He described his pain as aching, and rated it a seven.  He also complained of generalized joint and neck pain, and chest pain.  (Tr. 411-413)

On April 14, 2005, Dr. Robert F. Dallara performed a consultive psychological examination of Etapa.  (Tr. 363-366) Regarding Etapa's work related mental abilities, Dr Dallara opined that: (1) his ability to relate to others, including fellow workers and supervisors appears to be at least mildly impaired; (2) his ability to understand instructions appears to be adequate, while his ability to remember and carry out simple one or two-step instructions may be mildly impaired; (3) his ability to maintain attention and concentration appears adequate as there was no direct evidence during the examination to suggest impairment to his persistence or pace; and (4) his ability to withstand stress and pressure associated with day-to-day work activity appears to be at least mildly impaired.  (Tr. 366)

Dr. Dallara diagnosed Etapa with alcohol dependence in self-reported remission, depression NOS, and panic disorder NOS.  He assigned a GAF score of 55.

On May 27, 2005, Etapa presented to Russo for a follow up appointment.  He reported chronic back pain.  Russo noted a slow gait and slow movement when Etapa climbed onto the examination table.  Russo noted suspected disc disease and degenerative arthritis.  (Tr. 443)

On August 5, 2005, Chris Wood, PT, completed an assessment to determine eligibility for a disability assistance program.  Wood opined that due to pain, Etapa could stand/walk for up to 30 minutes without interruption, and for a total of one hour in an

eight hour workday.  He opined that Etapa was moderately limited in his ability to reach and to engage in repetitive foot movements.  He was markedly limited in his ability to bend, and in handling. Wood did not test Etapa's ability to lift, carry, push, or pull.  (Tr. 448)

On August 29, 2005, Etapa presented to Quiana.  Quiana noted that Etapa was in distress, angry, and irritable.  His mood was dysphoric.  His speech was coherent; his judgment was not impaired; and his insight was fair. Quiana's assessment was that Etapa was depressed, anxious, and in pain.  She diagnosed rule out bipolar depression and assigned a GAF score of 45.  (Tr. 442)

Also on August 29, 2005, Quiana completed a Request for Employment Information on behalf of Etapa from the Summit County Department of Jobs and Family Services.  She indicated that Etapa was not employable because of depression, anxiety, and chronic persistent back pain.  She further indicated that he could not participate in an education and training program because of chronic irritability and difficulty concentrating that prevent him from being able to follow through on education and training.  (Tr. 445)

Quiana also completed a mental functional capacity assessment on August 29, 2005.  In it she opined that  Etapa  was not significantly limited in his ability to: (1) understand, remember, and carry out short and simply instructions; (2) interact appropriately with the general public; ask simple questions, or request assistance; (3) maintain socially appropriate behavior, and adhere to basic standards of neatness and cleanliness; and (4) set realistic goals or make plans independent of others. (Tr. 449). He was moderately limited in his ability to: (1) remember locations and work-like

12

procedures; (2) understand and remember detailed instructions; (3) carry out detailed instructions; (4) maintain attention and concentration for extended periods; (5) sustain an ordinary routine without special supervision; (6) work in coordination with or proximity to others without being distracted by them; (7) make simple work-related decisions; (8) respond appropriately to changes in the work setting; (9) be aware of normal hazards and take appropriate precautions; and (10) travel to unfamiliar places or use public transportation.  He was markedly limited in his ability to: (1) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; (2) complete a normal workday or workweek without interruptions from psychologically based symptoms, and to perform at a consistent pace without an unreasonable number or length of rest periods; (3) accept instructions and respond appropriately to criticism from supervisors; and (4) get along with coworkers or peers without distracting them or exhibiting behavioral extremes.  (Tr. 449)

### C.  Hearing Testimony

Etapa testified that he served in the Marine Corps for four years.  (Tr. 530) After leaving the Marine Corps, Etapa worked in various sales positions.  He testified that he was fired from all his sales jobs because he had difficulty dealing with the job stress.  (Tr. 531)  Etapa worked as a fabricator from 1995-1999.  (Tr. 524) He was fired from these jobs because he was constantly hurting his right hand and his back, and filing workers' compensation claims.  (Tr. 518, 523) After his last job,  Etapa attended the University of Akron. He did well initially, but stopped attending because of the stress.  (Tr. 533)

Etapa testified that his main physical problems are his back and neck injury.  He

13

stated that the neck injury has caused him to lose control of his right hand.  He stated that his hand is always numb, and he cannot grasp or carry objects with it.  (Tr. 518) His back problems cause him problems with his legs.  He has no strength in his legs because his back problems prevent him from exercising.  (Tr. 547) He also has pain in his elbows and knees (Tr. 547) and has a hard time climbing stairs.  (Tr. 517)

Etapa testified as follows.  He has suffered from anxiety and depression for many years.  (Tr. 519) He has taken many medications for his mental problems, with limited success.  (Tr. 519) He avoids people and does not go out much.  (Tr. 519) Although he has his own house, he lives with his mother because he had trouble caring for himself. (Tr. 516) He helps his mother by getting the mail, feeding the dog, and cooking.  (Tr. 541) He cannot mow the grass. (Tr.542) On a good day he can walk about a quarter of a mile at a slow pace, but would be out of breath.  He carries albuterol with him to help him with his breathlessness.  (Tr. 547-548) He has difficulty concentrating even when he is not taking his pain medication.  (Tr. 549)

The ALJ presented the following hypothetical to the VE:

> [An] individual [who]  would be at the date of onset ...44 years old and have a GED with a vocational background identical to that of Mr. Etapa.  This individual would have the following exertional limitations. They'd be limited to the light level of work exertionally....[T]hey could lift up to 20 pounds occasionally, 10 pounds frequently; could stand and/or walk for six hours out of the eight-hour day; could sit for six hours; and could push or pull up to 20 pounds occasionally and 10 pounds frequently. In addition, this individual would be limited to occasionally stooping or crouching.  This individual would be limited to routine work.  They could not perform high production quota work or piece work.  They could have superficial interaction with co-workers and supervisors and occasional interaction with the public but without negotiation or confrontation with either group.

(Tr. 566)

14

The VE testified that such an individual would not be able to do Etapa's past relevant work.  (Tr. 567) He further testified that there would be jobs for such an individual in the national, local, and regional economy.  These jobs include: (1) mail clerk, 918 jobs in the Akron metropolitan area, 7,900 statewide, and 198,000 nationwide; (2) housekeeper, 980 jobs in the Akron metropolitan area, 9,200 statewide, and 246,000 nationwide; and (3) order filler, 740 jobs in the Akron metropolitan area, 14,000 statewide, and 281,000 nationwide.  (Tr. 567)

The ALJ then asked the VE to consider the same hypothetical worker he had described, but this worker would be off task 20 percent of the time due to anxiety.  (Tr. 568)  The VE testified that there would be no jobs for such an individual.  (Tr. 568)

### III.  Standard for Disability

A claimant is entitled to receive benefits under the Act when she establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981).  A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 416.905(a).  To receive SSI benefits, a recipient must also meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits.  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a

15

finding of disability. A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d)(2000). Fourth, if the claimant's impairment does not prevent her from doing her past relevant work, the claimant is not disabled. For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. Abbott v. Sullivan, 905 F.2d 918, 923 (6th Cir. 1990).

### IV. Summary of Commissioner's Decision

In relevant part, the ALJ made the following findings:

1. The claimant met the insured status requirements of the Social Security Act through September 30, 2004;

2. The claimant has not engaged in substantial gainful activity since August 1, 1999, the alleged onset date...;

3. The claimant has the following severe impairments: arthritis of the lumbar spine..., protruding disc of the cervical spine..., obesity..., major depressive disorder...,alcohol abuse...,and panic disorder...;

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1...;

5. [T]he claimant has the residual functional capacity to perform the exertional and nonexertional requirements of basic work-related activities except for lifting, carrying, pushing and pulling more than 10 pounds frequently, and up to 20 pounds more than occasionally; standing and/or walking for more than a total of about 6 hours in an 8-hour workday; sitting for more than a total of about 6 hours in an 8-hour workday; (exertional); work involving more than occasional stooping and crouching; more than routine work without high production quotas or piecework; or more than occasional

16

interaction with the public, and superficial interaction with co-workers or supervisors, without negotiation or confrontation (nonexertional);

6.  The claimant is unable to perform any past relevant work...;

7.  The claimant was born on February 8, 1955 and was 44 years old, which is defined as a younger individual age 45-49, on the alleged disability onset date; he is currently 51, which is defined as closely approaching advanced age...;

8.  The claimant has at least a high school education and is able to communicate in English;

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that claimant is "not disabled" whether or not the claimant had transferrable job skills...;

10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform...; and

11.  The claimant has not been under a "disability" as defined in the Social Security Act from August 1, 1999 through the date of this decision....

(Tr.21-22, 27-29)

## V.  Standard of Review

This Court's review is limited to determining whether there is substantial evidence in the record to support the administrative law judge's findings of fact and whether the correct legal standards were applied.  *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).  Substantial evidence has been defined as "[e]vidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be

somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *see also Richardson v. Perales*, 402 U.S. 389 (1971).

## VI.  Analysis

### A.  The ALJ Properly Considered The Medical Opinions of Dr. Robinson, Mr. Wood, and Ms. Quiana

Etapa claims that the ALJ failed to properly weigh the medical opinions of Dr. Robinson, Mr. Woods, and Ms.Quiana, and failed to properly articulate his rationale for rejecting each of the opinions.  Etapa's argument misunderstands the ALJ's opinion, as well as the law, and is accordingly without merit.

Pursuant to 20 C.F.R. § 404.1527 (4) (d), the ALJ is required to evaluate every medical opinion he receives.  He is not, however, required to articulate his rationale for rejecting an opinion, unless it is the opinion of a treating physician.[3]  *See* 20 C.R.F. § 404.1527 (4) (d) (2).  *See also*, *Kornecky v. Comm'r of Soc. Sec.*, 2006 WL 305648 **10:

> While it might be ideal for an ALJ to articulate his reasons for crediting or discrediting each medical opinion, it is well settled that: "[a]n ALJ can considerer all the evidence without directly addressing in his written opinion every piece of evidence submitted by a party.  Nor must an ALJ make explicit credibility findings as to each bit of conflicting testimony, so long as his factual findings as a whole show that he implicitly resolved such conflicts."

In this case, the ALJ met his obligation to evaluate every medical opinion he received; and based on his evaluation of the evidence, there is substantial evidence to support his

---

[3] Etapa does not claim that Dr. Robinson, Mr. Wood, or Ms. Quiana are treating physicians.  The record reflects that Dr. Robinson performed a consultive examination, that Mr. Wood is a physical therapist, and that Ms. Quiana is a registered nurse clinical specialist.

18

findings.

### 1. Dr. Robinson

Etapa challenges the ALJ's decision to reject Dr. Robinson's opinion as to Etapa's manipulative limitations.  *See* Plaintiff's Brief on the Merits p.13.  In support, Etapa asserts that the ALJ erred when he concluded that Dr. Robinson relied on Etapa's subjective complaints of pain in forming his opinion.[4]

It is true that Dr. Robinson relied upon more than Etapa's complaints of pain of in forming his opinion.  For example, Dr. Robinson relied upon objective medical evidence such as a physical examination indicating a positive straight leg test and an X-ray indicating degenerative disc disease.  (Tr. 333)  However, this evidence is not relevant or material to Etapa's manipulative limitations.[5]  With regard to Etapa's manipulative limitations, the ALJ correctly noted that Dr. Robinson did not review the nerve conduction studies that Etapa claims support his diagnosis of carpal tunnel syndrome, nor did Dr. Robinson order any tests to confirm the diagnosis.  Additionally, Dr. Robinson's findings indicate that, with the exception of Etapa's pinch in his right hand, his grasp, manipulation, pinch, and fine coordination were normal.  (Tr.335) Thus, any error committed by the ALJ in characterizing Dr. Robinson's opinion is harmless.

Furthermore, there is other substantial evidence that supports the ALJ's findings as to Etapa's manipulative abilities.  The ALJ accepted and gave substantial weight to

---

[4]The ALJ stated, "I give Dr. Robinson's opinion no weight because he relied on the claimant's assertion of pain in forming his opinion of the exertional limitations he imposed."  (Tr. 24)

[5]*See* *Jordan v. Comm'r Soc. Sec.*, 548 F. 3d 417,423 (6th Cir. 2008) citing 20 C.F.R. § 404.1569a(b)and (c) (manipulative limitations are nonexertional limitations).

the November 2004 opinion of consultive physician Dr. Anaya, an opinion obtained three years after Dr. Robinson's opinion.  Dr. Anaya opined that Etapa's ability to grasp and manipulate appeared grossly normal. He further opined that Etapa should have no difficulty with sitting, standing, transient walking, or handling light objects with his upper extremities.  (Tr. 369)

Reports of consultive physicians, like Dr. Robinson and Dr. Anaya, are not entitled to any special degree of deference.  The ALJ may reasonably choose to accept one opinion over another.  The ALJ's decision to discount Dr. Robinson's opinion and give greater weight to Dr. Anaya's opinion was proper.

### 2.  *Physical Therapist Wood*

Etapa claims the ALJ erred by rejecting Wood's opinion on the ground that Wood is not an acceptable medical source, and by failing to articulate his reasons for rejecting Wood's opinion.  Etapa's argument is without merit.  Etapa incorrectly asserts that the ALJ rejected Wood's opinion on the ground that Wood is not an acceptable medical source.  Indeed, the ALJ acknowledged that he may consider medical opinions from sources who are not acceptable medical sources.  Rather, the ALJ rejected Wood's opinion that Etapa was unemployable for the reason that this opinion was not consistent with the evidence of record.  Specifically, the x-ray revealed mild hypertrophic changes involving C3-C7, with very minimal narrowing, and minimal degenerative arthritic changes of the lumbosacral spine with marginal spur formation and narrow disk space between L5 and S2; nevertheless, Wood, relying upon Etapa's representations, concluded that Etapa was unemployable.  Additionally, Dr. Anaya's opinion, which the ALJ substantially credited, does not support Wood's conclusion that Etapa is

unemployable. Thus, although he was not required to do so, the ALJ did articulate his reasons for rejecting Wood's opinion.  *See* Social Security Ruling 06-03p, 2006 WL 2329939 *6:

> [T]here is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator generally should explain the weight given to opinions from these "other sources" or otherwise ensure that the discussion of evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning....

Moreover, Wood's opinion that Etapa is unemployable is not a medical opinion, but an opinion regarding an issue reserved to the commissioner.  Therefore, it is not entitled to any particular deference. *See* 20 C.F.R. § 404.1527 (e) (3) ( "We will not give any special significance to the source of an opinion on issues reserved to the Commissioner...")

Similarly, as neither of these providers is a treating physician, the ALJ can reasonably credit Dr. Anaya's opinion over Wood's opinion.

### 3. Registered Nurse Clinical Specialist Quiana

Etapa also claims the ALJ rejected Quiana's opinion because she is not an acceptable medical source.  As with Wood, this is not the case.  The ALJ specifically stated he considered the evidence presented by Quiana.  He concluded however, that her opinion, including her conclusion that Etapa was markedly limited in several areas, was not supported by an examining psychiatrist or psychologist, or by the evidence of record as a whole.

The ALJ gave moderate weight to the opinion of consultive psychologist Gary Sipps, Ph. D., who opined that Etapa was mildly to moderately impaired.  He gave

substantial weight to the opinion of psychologist Kevin Goeke, Ph. D., who opined that Etapa was mildly to moderately limited.  He also noted the opinion of Robert Dallara, Jr., Ph. D., who opined that Etapa was mildly limited.  As none of these sources are treating physicians, the ALJ's decision to credit these opinions over Quiana's opinion is proper.

**B.  The ALJ's Hypothetical Question To The VE Was Adequate**

Etapa argues that the ALJ's hypothetical question to the VE was inadequate in two respects.  First, he asserts that the ALJ's hypothetical question was inadequate because it failed to include Etapa's manipulative limitations.  Second, he claims it was inadequate with respect to Etapa's SSI claim, because it failed to include the assumption that Etapa was closely approaching advanced age.  Each of these claims is without merit.

**1.  The ALJ Properly Excluded Etapa's Manipulative Limitations**

A VE's testimony must be based on a hypothetical question that accurately portrays the claimant's physical and mental impairments.  *Varley v. Secretary of Health and Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) Etapa claims that the hypothetical question posed to the VE is inadequate because it failed to include the manipulative limitation presented in Dr. Robinson's and physical therapist Wood's opinions.  He further argues that the VE opined that there were no jobs available for an individual with these limitations.  While this may be true, it is irrelevant as these impairments were not accepted by the ALJ.  A hypothetical question need only include those impairments that were accepted by the ALJ, and may excluded impairments that the ALJ reasonably discredited.  *Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994)  As the ALJ did not err in rejecting the opinions of Dr. Robinson and physical therapist Wood, the ALJ properly

22

excluded these limitations from his hypothetical question.  Accordingly, the hypothetical question posed to the VE adequately portrays Etapa's impairments.

### 2.  The ALJ Properly Addressed Etapa's Age

Etapa claims the ALJ erred in determining his eligibility for SSI because the hypothetical posed to the VE did not specifically include the assumption that Etapa was 51 years old at the time of hearing, which is defined as closely approaching advanced age.  20 C.F.R. §§ 404.1563, 416.963[6] Etapa argues that this omission requires reversal of the ALJ's decision.  It does not.

A VE's testimony must be based on a hypothetical question that accurately portrays the claimant in all significant, relevant respects. *Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994) citing *Varley v. Secretary of Health and Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) This includes the claimant's age at the time of the decision because the claimant's age at the date of the decision governs the application of the regulations.  *Varley v. Secretary of Health and Human Servs.*, 820 F. 2d 777, 780 (6th Cir. 1987) Etapa argues that the hypothetical question posed to the VE was inadequate because it included the assumption that the individual was 44 years old at the date of the alleged onset of disability, but did not specifically include the assumption that the individual was currently 51 years old.[7]  Thus, Etapa argues that the VE's responses were limited a younger individual. The evidence does not support this argument.

---

[6] Etapa does not challenge the adequacy of the hypothetical question as it relates to his age for the purposes of determining his eligibility for DIB.  *See* Plaintiff's Brief on the Merits pp. 3-4.

[7]An individual age 45-49 is defined as a younger individual.  20 C.F.R.§§ 404.1565, 416.963

Before the ALJ posed his hypothetical question, he asked the VE whether he had a chance to review the file prior to the hearing, and whether he had been present for Etapa's testimony.  The VE responded affirmatively to both questions.  The VE then asked Etapa three questions to clarify what he had read in Etapa's file.[8]  The ALJ then asked the VE to consider an individual who would be at the date of the alleged onset (not the date of the hearing) 44 years old, and have an educational and vocational background identical to Etapa.  There is no evidence to suggest the VE ignored the ALJ's hypothetical question and based his answers on an individual who was 44 years old at the date of the hearing instead of the date of the alleged onset of disability.  Nor is there any evidence to suggest the VE did not in fact base his answers on an individual who was identical to Etapa in every relevant way, including his age.  Accordingly, the VE's testimony is not based on an erroneous characterization of the claimant.  The opinion is based on the evidence in the record.  The ALJ's reliance on the testimony of the VE is based upon substantial evidence.[9]

---

[8]Although the VE's questions do not address Etapa's age, they indicate that the VE had in fact reviewed Etapa's file prior to the hearing and was therefore aware of his age.

[9] In his decision, the ALJ specifically acknowledged that Etapa was 44 years old at the alleged onset of disability, and currently 51 years old.  (Tr. 27) Further, when Etapa's attorney posed his hypothetical questions, he asked the VE to assume a younger individual, something that the ALJ did not do.  (Tr. 568, 571)

24

## VII.  Decision

For the foregoing reasons, the decision of the Commissioner is supported by substantial evidence.  Accordingly, the decision of the Commissioner should be AFFIRMED.


s/*Nancy A. Vecchiarelli*
Nancy A. Vecchiarelli
U.S. Magistrate Judge


Date: May 5, 2009


## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within ten (10) days after being served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  See also *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**

25